## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

| | |
|---|---|
| Ryan Lee, individually and on behalf of all others similarly situated, | 1:22-cv-12258 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Walmart Inc., | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1. Walmart Inc. ("Defendant") markets and sells a subscription service known as Walmart+ ("Walmart Plus," "Subscription" or "Service").

2. Walmart Plus represents Defendant's entry into the "subscription economy," or the exchange of content, products and services for recurring, scheduled payments.

3. Industry sources claim that the subscription economy is growing nine times faster than the S&P 500, and that consumer subscription services have grown over four hundred percent in the past ten years and will reach to $1.5 trillion by 2025.

4. Companies value subscriptions to provide consistent revenue and "lock in" customers.

5. Consumers may value subscriptions to minimize friction of routine transactions.

6. The subscription economy is based on negative option marketing, where the customer's silence, or non-rejection of goods or services constitutes acceptance.

7. The name comes from the fact that to cancel their enrollment or agreement, the customer must exercise a "negative option" to affirmatively opt-out of the transactions.

8.    The Federal Trade Commission ("FTC") identified four types of negative options.

9.    Continuity plan consumers agree in advance to receive periodic shipments of goods or provision of services and incur charges until they take steps to cancel the arrangement.

10.   Automatic renewal plans involve the automatic renewal of contracts at the end of a fixed period unless consumers instruct otherwise.

11.   Other types include free-to-pay or nominal fee-to-pay conversion plans.

12.   These involve the customers receiving a good or service for a free or nominal price for an introductory period.

13.   However, if the customer does not affirmatively cancel their enrollment, they will be charged a significantly higher amount for the product or service.

14.   A 2018 report from the Better Business Bureau ("BBB") shows losses in "free trial offer" cases pursued by the FTC over the last ten years exceed $1.3 billion.

15.   From 2015 through 2017, the BBB received 36,986 complaints about "free trials."

16.   Data from the FBI Internet Crime Complaint Center reveal complaints are rising.

## I.    SUBCRIPTION'S BENEFITS ARE MISLEADING

17.   The Service costs $12.95 per month or $98.00 per year, and tells customers they can "save $1,300+ a year*" through "free delivery, fuel discounts, & more!"





18.    Potential customers are enticed to "Save $800+ with free delivery" and "$500+ on shipping fees."

19.    These benefits are potentially illusory, as disclosed by the fine print corresponding to the asterisk next to "Important details" at the bottom of the screen.

20.    This reveals that the savings are "compared against 2 deliveries/wk at non-member $7.95 fee + 2 Walmart.com orders under $35/wk at non-member $6.99 shipping fee."

> **\*Important details.**                    ✕
>
> \*Compared against 2 deliveries/wk at non-member $7.95 fee + 2 Walmart.com orders under $35/wk at non-member $6.99 shipping fee. Restrictions apply.

21.    However, Defendant's records would reveal that an average customer does not place orders for two deliveries per week nor make two orders from Walmart.com for less than $35 per week.

22.    While the prominent representations promote "Free delivery from your store" and "$0 delivery fees," the small print below reveals there is a "$35 order minimum," subject to additional restrictions with an "[A]dditional fee[s] [] for Express delivery."

## Free delivery from your store

✓ Get groceries & more as soon as today

✓ Same everyday low prices as in-store

✓ $0 delivery fees

$35 order minimum. Restrictions apply. Check availability in your area at sign-up. Additional fee applies for Express delivery.

23. While the prominent representations promote "Free shipping, no order minimum," and that "Items shipped by Walmart ship for free," the fine print below reveals this "Excludes most Marketplace items."

## Free shipping, no order minimum

✓ No $35 order minimum required

✓ Huge assortment of eligible items

✓ Items shipped by Walmart ship for free

*Excludes most Marketplace items, location & freight surcharges.

24. Customers signing up for the Subscription are not required to read or affirmatively acknowledge the delivery and shipping limitations.

25. At the top of walmart.com/plus, two "Start 30-day free trial" links take customers to walmart.com/plus/plans where they can sign up for a trial before learning of these limitations.

26. Where a customer already has a Walmart.com account they are enticed to "Save with free delivery! [and] Try Walmart+ free for 30 days."



4

27.    By clicking on the above link, customers bypass walmart.com/plus and are automatically taken to *walmart.com/plus/plans*.

28.    Here, they choose between an annual or monthly Walmart Plus plan, confirm their payment method, and commence their 30-day free trial.



29.    This page fails to mention the limitations of the promised free shipping and delivery.

30.    While there is a link to the "complete Terms," it directs consumers to the general Walmart.com Terms of Use, not the specific Walmart+ Terms of Use.

31.    Additionally, review of any terms is not required to start the trial.

## II.    DECEPTIVE SUBSCRIPTION PRACTICES

### A.  Default Autorenewal After Trial Period

32.    Defendant entices customers to sign up by promoting Walmart Plus as a way to "Save time and money with free delivery* and free shipping** – Terms apply – Try free for 30 days."

33.    However, some customers have reported being charged an immediate monthly or annual fee upon signing up in the free trial.

34.    Even when the trial does not result in an immediate charge, tethering a trial to enrollment in an auto-renewing subscription is deceptive and not "free" because the customer cannot merely use the service during this period, and must remember to cancel before the end date, imposing a burden on their time and attention.

35.    Defendant's terms and conditions state that after "ANY FREE TRIAL PERIOD, YOU WILL BE CHARGED IMMEDIATELY FOR THE INITIAL TERM [and] FOLLOWING THE INITIAL TERM, YOUR WALMART+ SUBSCRIPTION [] WILL AUTOMATICALLY RENEW."

36.    Other subscription services are designed for customers to "opt-in" to automatic renewal either after an initial term or at other points in their usage.

37.    By adopting a default autorenewal, Defendant takes advantage of consumer inertia because autorenewal users are seven times more likely to "continue," or not cancel, their subscriptions, compared to users enrolled in an autocancel subscription.

38.    This is confirmed by psychological studies showing that consumers tend to procrastinate on mundane tasks especially where they are deemed to be boring or difficult, which includes cancelling subscriptions.

39.    Researchers have identified "status quo bias" as making consumers susceptible to "sludge," where people are unlikely to depart from a default option, even where it would be in their interest to do so.

40.    One study involved participants who believed there was an 80% chance they would

fill in forms to obtain money back in a promotion, when only 30% of consumers actually did so.

41.   Defendant fails to provide a pro-rated refund for consumers depending on when they cancel relative to where they are in their subscription term.

42.   Defendant's lengthy terms and conditions states "[T]here are no refunds for Walmart+ Membership [] fees paid," which means customers do not receive any pro-rated refund, depending on when they cancel relative to where they are in their subscription term.

B.   Cancellation Obstacles

43.   Defendant has a scientifically designed a subscription process to reduce "churn," an industry term for customer cancellation rates.

44.   These mechanisms have been developed and tested by experts in behavioral science and psychology to limit churn to a set percentage.

45.   This includes disclosing the cancellation method in Paragraph 1.1 of the Terms of Use, instructing customers to "call[ing] Walmart Customer Care [], or through your Walmart Account."

46.   Behavioral studies prove that when customers are presented two sequential options, over 60 percent choose the first option, even where it results in sub-optimal outcomes.

47.   When these customers call Walmart, the average waiting time to speak with a representative is 37 minutes, shown through an independent customer assistance website.[1]

---

[1] That the number indicated in the terms and conditions may differ from that in this image, that is because companies have numerous inbound numbers which are all funneled to the same call system.

## WalMart Phone Number

Call WalMart customer service faster with GetHuman

**800-925-6278**

CUSTOMER SERVICE

Current Wait: **37 mins** (33m avg)

48.    For the smaller percentage of users who choose the second cancellation option via their Walmart account, they are overwhelmed by the numerous selections and settings, and not conspicuously presented with how to cancel.

49.    Defendant fails to separately notify customers prior to the expiration of their free trial that they will be charged shortly if they fail to cancel.

50.    Defendant fails to separately notify customers prior to the end of their subscription term that if they take no action, they will be charged again for that subscription term.

51.    Even where Defendant's own records show that customers have not used the service during or after the trial, it fails to affirmatively notify them beyond the monthly charge appearing on a bank or card statement.

52.    Defendant places barriers in front of members seeking to cancel in the form of screens asking whether they are sure they want to cancel and/or attempting to make them feel guilty for cancelling.

C.    <u>Cancellations Not Always Honored</u>

53.    Where customers are able to cancel the Service, many continue to be charged.

54.    This is due to known internal errors within Walmart's billing system which occur at consistent rates.

55.    Consumers have voiced their frustrations with such practices online, with one customer stating "I deleted my account and they charged me for renewal lol."



56.    Another frustrated user wrote, "My Walmart plus was cancelled in April. I continue to get charged the **.** fee."

57.    One consumer advocacy website contains numerous similar complaints.

> Follow other customers in the midst of the same issue or find a prior solution.
>
> Activated Walmart plus by mistake and then cancelled need refund
>
> I need a refund for my Walmart plus. I don't want it nd canceled it
>
> Cancelled walmart plus membership, but keep getting charged monthly fee
>
> I need to speak to a person about my Walmart plus membership
>
> I cannot cancel my Walmart plus subscription on your app I need you to cancel my...
>
> I need to speak with someone about a problem with my Walmart plus account.
>
> I joined Walmart plus as a trial only to use Walmart pay at the register - I forg...

Activated Walmart plus by mistake and then cancelled need refund

I need a refund for my Walmart plus. I don't want it [a]nd canceled it

Cancelled walmart plus membership, but keep getting charged monthly fee

I need to speak to a person about my Walmart plus membership

I cannot cancel my Walmart plus subscription on your app I need you to cancel my...

I need to speak with someone about a problem with my Walmart plus account.

I joined Walmart plus as a trial only to use Walmart pay at the register - I forg...

D.  Deceptive Charging Practices

58.    Another unfair practice of Walmart Plus is where a customer uses a specific payment method to sign up.

59.    Should a customer forget to cancel and if the payment method initially applied has expired or been removed, Defendant will charge any payment method.

60.    Though this is disclosed, it is done discreetly through the terms beneath the larger

9

representations.

61.    This practice disregards that consumers typically choose which payment methods to use for specific products and services for various reasons.

62.    These include interest-free payment periods, different interest rates and balances, and whether a payment method may be shared with another individual such as a spouse or child.

63.    One customer described how he "recently switched from a standard Platinum card to [a] Schwab Platinum card," and was "in the process of transferring [recurring transactions] over" to this payment method.

64.    When "the billing failed to go through [on the original card]," Defendant "charged the monthly membership to a random Chase card [he] had apparently used once for a purchase."

65.    Defendant fails to transmit monthly notices of charge which would alert customers they will be charged on a specific date.

66.    Defendant fails to inform customers when a payment method they initially use is no longer active and that it will attempt to charge all available payment methods on a user's account until the amount is paid.

67.    The result is unwanted charges which are difficult to get refunded.

68.    Such a refund request can only be made over the phone, where the wait time is over thirty minutes.

69.    Many customers give up before speaking to a representative due to the long hold time.

70.    A high percentage of customers calling customer service have their calls disconnected due in part to technical failures with Defendant's call centers.

71.    Other reasons for calls being terminated without the customer's consent include

requirements imposed on call center employees for their average call times.

72.    When a customer has a complex problem that requires several levels of approval, the call duration will last significantly longer.

73.    The result is that call center employees must then ensure their other calls are significantly shorter than the average call time to bring their overall average call down.

74.    This is done through prematurely terminating calls prior to resolving customer complaints about charges imposed to their separate payment methods.

75.    Should customer resolution time exceed the average time required, call center employees may suffer penalties such as lower priority in selecting shifts, lack of promotion, and even termination.

## III.    CONCLUSION

76.    Defendant makes other representations and omissions with respect to the service which are false and misleading.

77.    The value of the Subscription that Plaintiff subscribed to was materially less than its value as represented by Defendant.

78.    Defendant sold more of the Subscription and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

79.    Plaintiff paid more for the Service than he would have paid had he known the above-referenced facts, and would not have purchased it or would have paid less.

80.    As a result of the false and misleading representations, the Subscription is sold at a premium price, approximately no less than $12.95 a month or $98.00 per year, excluding tax and sales, and higher than it would be sold for absent the misleading representations and omissions.

Jurisdiction and Venue

81. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

82. The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

83. Plaintiff Ryan Lee is a citizen of Michigan.

84. Defendant Walmart Inc. is a Delaware corporation with a principal place of business in Bentonville, Arkansas, Benton County.

85. The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

86. The members of the class Plaintiff seeks to represent are more than 100, because the subscription program identified here has been available for two years with the practices identified here, in the states covered by Plaintiff's proposed classes.

87. Venue is in this District because Plaintiff resides in this District and the actions giving rise to the claims occurred within this District.

88. This action should be assigned to the Northern Division in this District because a substantial part of the events or omissions giving rise to these claims occurred in Saginaw County, including Plaintiff's subscription to and/or use of the Subscription and awareness and/or experiences of and with the issues described here.

Parties

89. Plaintiff Ryan Lee is a citizen of Saginaw, Saginaw County, Michigan.

90. Defendant Walmart Inc. is a Delaware corporation with a principal place of business in Bentonville, Benton County, Arkansas.

91.     Walmart is an American multinational retail corporation that operates a chain of over 5,000 supercenters, selling everything from furniture to groceries.

92.     Industry estimates reveal Walmart Plus attracted 10 million households shortly following its launch in 2020, achieving an equity value exceeding $140 million.

93.     Plaintiff subscribed to and used the Subscription on one or more occasions within the statutes of limitations for each cause of action alleged, in 2022, and/or among other times.

94.     Plaintiff had signed up for the Subscription previously but rejoined with the promise of additional features and benefits.

95.     Plaintiff believed and expected that the Subscription provided free shipping and free delivery benefits without the numerous restrictions or limitations, a free trial which did not charge users immediately after the trial, that he would not be subject to autorenewal, would receive a pro-rated refund if he cancelled prior to the renewal dates, and that cancellation would be as easy as signing up.

96.     Plaintiff relied on the words, terms coloring, descriptions, and/or images advertising the Subscription, statements, omissions, claims, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Subscription and separately, through in-store, digital, audio, and print marketing.

97.     Plaintiff subscribed to the Subscription at or exceeding the above-referenced price.

98.     Plaintiff would not have subscribed to the Subscription if he knew the representations and omissions were false, unfair, and misleading or would have paid less.

99.     The Subscription was worth less than what Plaintiff paid, and he would not have paid as much absent Defendant's false and misleading statements and omissions.

100.    Plaintiff intends to, seeks to, and will subscribe to the Subscription again when he

can do so with the assurance the Subscription's representations are consistent with its abilities, attributes, and/or composition and there were no material omissions.

101.  Plaintiff is unable to rely on the labeling and representations not only of this Subscription, but other subscription services, because he is unsure whether those representations are truthful.

Class Allegations

102.  Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Michigan Class:** All persons in the State of Michigan who subscribed the Subscription during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Iowa, Kansas, Montana, Alaska, Arkansas, Wyoming, West Virginia, Kentucky, South Carolina, South Dakota, and Utah who subscribed to the Subscription during the statutes of limitations for each cause of action alleged.

103.  Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

104.  Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

105.  Plaintiff is an adequate representative because his interests do not conflict with other members.

106.  No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

107.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

108.  Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

109.  Plaintiff seeks class-wide injunctive relief because the practices continue.

Michigan Consumer Protection Act ("MCPA"),<br>
MCL § 445.901, <em>et seq.</em>

110.  Plaintiff incorporates by reference all preceding paragraphs.

111.  Plaintiff believed the Subscription provided free shipping and free delivery benefits without any restrictions or limitations, a free trial which did not charge users immediately after their first 30-days, that he would not be enrolled into autorenewal, that he would receive a pro-rated refund if he cancelled his subscription prior to the renewal date, and that cancellation would be as easy as signing up.

112.  Defendant's false, misleading, and deceptive representations and omissions are material in that they are likely to influence consumer subscribing decisions.

113.  Defendant misrepresented the Subscription through statements, omissions, ambiguities, half-truths and/or actions.

114.  Plaintiff relied on the representations and omissions to believe the Subscription provided free shipping and free delivery benefits without any restrictions or limitations, a free trial which did not charge users immediately after their first 30-days, that he would not be enrolled into autorenewal, that he would receive a pro-rated refund if he cancelled his subscription prior to the renewal date, and that cancellation would be as easy as signing up.

115.  Plaintiff and class members would not have subscribed to the Subscription or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts</u>
<u>(Consumer Fraud Multi-State Class)</u>

116.  The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

117.  The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

118.  Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

119.  As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages.

<u>Breaches of Express Warranty,</u>
<u>Implied Warranty of Merchantability/Fitness for a Particular Purpose and</u>
<u>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*</u>

120.  The Subscription was identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that it provided free shipping and free delivery benefits without any restrictions or limitations, a free trial which did not charge users immediately after their first 30-days, and that they (1) would not be enrolled into autorenewal, (2) would receive a pro-rated refund if the subscription was cancelled prior to the renewal date, and (3) would be able to cancel as easily as signing up.

121.  Defendant directly marketed the Subscription to Plaintiff and consumers through its advertisements and marketing, through various forms of media and targeted advertising.

122.  Defendant knew the service attributes that potential customers like Plaintiff were seeking and developed its marketing directly meet those needs and desires.

123. Defendant's representations about the Subscription were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it provided free shipping and free delivery benefits without any restrictions or limitations, a free trial which did not charge users immediately after their first 30-days, and that he (1) would not be enrolled into autorenewal, (2) would receive a pro-rated refund if the subscription was cancelled prior to the renewal date, and (3) would be able to cancel as easily as signing up.

124. Defendant's representations affirmed and promised that the Subscription provided free shipping and free delivery benefits without any restrictions or limitations, a free trial which did not charge users immediately after their first 30-days, and that he (1) would not be enrolled into autorenewal, (2) would receive a pro-rated refund if the subscription was cancelled prior to the renewal date, and (3) would be able to cancel as easily as signing up.

125. Defendant described the Subscription so Plaintiff and consumers it provided free shipping and free delivery benefits without any restrictions or limitations, a free trial which did not charge users immediately after their first 30-days, and that they (1) would not be enrolled into autorenewal, (2) would receive a pro-rated refund if the subscription was cancelled prior to the renewal date, and (3) would be able to cancel as easily as signing up, which became part of the basis of the bargain that it would conform to its affirmations and promises.

126. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Subscription.

127. This duty is based on Defendant's outsized role in the market for this type of service, a trusted company, known for its fairness to consumers.

128. Plaintiff recently became aware of Defendant's breach of the Subscription's warranties.

129.   Plaintiff provides or will provide notice to Defendant, its agents, representatives, retailers, and their employees that it breached the express and implied warranties associated with the Subscription.

130.   Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

131.   The Subscription did not conform to its affirmations of fact and promises due to Defendant's actions.

132.   The Subscription was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made in media and advertising, because it was marketed as if it provided free shipping and free delivery benefits without any restrictions or limitations, a free trial which did not charge users immediately after their first 30-days, and that customers (1) would not be enrolled into autorenewal, (2) would receive a pro-rated refund if the subscription was cancelled prior to the renewal date, and (3) would be able to cancel as easily as signing up.

133.   The Subscription was not merchantable because Defendant had reason to know the particular purpose for which the Subscription was subscribed to by Plaintiff, because he expected it provided free shipping and free delivery benefits without any restrictions or limitations, a free trial which did not charge users immediately after their first 30-days, that he would not be enrolled into autorenewal, that he would receive a pro-rated refund if he cancelled his subscription prior to the renewal date, and that cancellation would be as easy as signing up, and he relied on Defendant's skill and judgment to select or furnish such a suitable product.

134.   Plaintiff and class members would not have subscribed to the Subscription or paid as

much if the true facts had been known, suffering damages.

Negligent Misrepresentation

135.  Defendant had a duty to truthfully represent the Subscription, which it breached.

136.  This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, a trusted company, known for its high-quality products, honestly marketed to consumers.

137.  Defendant's representations and omissions regarding the Subscription went beyond the specific representations in media and advertising, as they incorporated the promises and commitments to quality, transparency, and putting customers first that it has been known for.

138.  These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

139.  The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

140.  Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their subscription to the Subscription.

141.  Plaintiff and class members would not have subscribed to the Subscription or paid as much if the true facts had been known, suffering damages.

Fraud

142.  Defendant misrepresented and/or omitted the attributes and qualities of the Subscription, that it provided free shipping and free delivery benefits without any restrictions or limitations, a free trial which did not charge users immediately after their first 30-days, and that customers (1) would not be enrolled into autorenewal, (2) would receive a pro-rated refund if the

19

subscription was cancelled prior to the renewal date, and (3) would be able to cancel as easily as signing up.

143.   Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception of its practices, through statements and omissions.

144.   Defendant knew of the issues described here yet did not address them.

145.   Defendant's fraudulent intent is evinced by its knowledge that the Subscription was not consistent with its representations.

Unjust Enrichment

146.   Defendant obtained benefits and monies because the Subscription was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class;

3. Awarding monetary damages, statutory and/or punitive damages and interest pursuant to statutory and common law claims;

4. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

5. Other and further relief as the Court deems just and proper.

Dated:    September 23, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com